# Expert Report

# HSA St. Joseph LLC v. Sosa

# 4:25-cv-01411

# Filed by: Clint Sosa, Defendant

# Expert Report of
# Heather J. Taylor, Owner Mad Hat Maven, LLC
## Case 4:25-cv-01411

1. I am Heather J. Taylor. I am the owner of Mad Hat Maven, LLC, in Houston, Texas. I have over 25 years of expertise in marketing, public relations, digital strategy, data analytics, content creative, event coordination, video production, and brand recognition methodology. I have provided expert consultations in these areas for a wide range of companies, including Chevron, Noble Energy, NRG, CenterPoint Energy, Memorial Hermann Hospital, UPI Loan Fund, AIDS Foundation Houston, and Cadence Bank. My business mailing address is 1942 W. Gray Street, #110A, Houston, TX 77019. Mad Hat Maven is a full-service consulting firm providing expert marketing, public relations, and internal and external communications, including social media management.

**Assignment**

2. I have been asked to provide my expert opinions regarding this case in support of Defendant, Clint Sosa. I have also been asked to review the reports provided by Mr. Sosa, to the extent that his reports incorporate the results from his term of employment regarding daily marketing activities, creative content creation, social media strategy, and the termination letter.

**Summary of Opinion**

3. My overall opinion in this matter is that HSA St. Joseph's methodology and procedures are fundamentally flawed, rendering their password issue, data, and purported results unreliable and insufficient to establish any financial loss. In my view, HSA's expectations, limited expertise in social media, and lack of quantifiable supporting data do not provide a sound basis for evaluating consumer behavior, projecting sales attributable to social media, or assessing reasonable performance expectations for a marketing manager during the first ninety days of employment. I explain the bases for these opinions in the sections below. HSA's failure to properly offboard its most senior marketing communications employee—who held sole access to critical social media assets—falls well below accepted industry standards and basic risk management practice. In addition, contacting Mr. Sosa 21 days after his termination and asking him, through intermediaries unfamiliar with the relevant logins or platform mechanics, to remedy issues HSA created was both poorly executed and unreasonable, imposing unnecessary burdens on an employee the organization had already chosen to discharge. Additionally, once Mr. Sosa

informed HSA's representatives that he no longer possessed any passwords, HSA should have engaged an internal marketing staff member or qualified marketing expert to handle account recovery, which relies on standard, well-known procedures rather than any confidential or proprietary information.

**Qualifications**
4. I am a senior marketing, public relations, and digital strategy consultant with more than 25 years of experience leading high-impact campaigns for global brands, entertainers, and mission-driven organizations. Over the course of my career, I have planned, executed, and optimized integrated programs that drive visibility, engagement, and revenue, giving me a practical, results-based understanding of how social media and marketing actually perform in the marketplace.
5. I began my career in the entertainment and hospitality industries, where I led web development, managing and coding social media (e.g. MySpace, Facebook, Friendster, and AOL), creating content, PR, and engagement strategies for major brands, personalities, and celebrities and later served as CEO of Alliance Worldwide Communications. In that role, I negotiated deals with top networks and secured national and international coverage across outlets such as Rolling Stone, People, Los Angeles Times, Town & Country, and international broadcast shows. This work required sophisticated media planning, message development, contract negotiations, and audience targeting long before "social media strategy" became a formal discipline.
6. Since relocating to Houston, I have overseen traditional and digital marketing for a wide range of B2B and B2C sectors including oil and gas, medical, energy, chemical, wellness, construction, and real estate. I have led campaigns for organizations such as Reliant, NRG, Chevron, Texaco, Exxon, KPMG, Cadence Bank, Memorial Hermann Hospital, Budweiser, and others. These programs integrated social media, content marketing, SEO, paid media, and analytics, and I have been recognized with multiple industry awards including ADDYs from the American Advertising Federation, NHAB awards, GHBA Prism Awards, BMA Lantern Awards, Hermes, Muse, and MarCom Awards.
7. Since 2018, I have owned and led Mad Hat Maven, a full-service communications firm in Houston, Texas. In this capacity, I routinely advise executives on brand positioning, social media strategy, campaign measurement, and reasonable performance expectations for marketing staff and channels. My work includes setting social media goals, defining KPIs, interpreting engagement and conversion data, and explaining the limitations of what social platforms can realistically deliver within specific timeframes and budgets.
8. In 2025, I also became an Executive Producer for a creative company partnered with Bread of Life in Houston, producing content to support philanthropic initiatives around the world. Across these roles, I bring a combination of creative storytelling, hands-on digital expertise, and practical experience with how campaigns perform

over time. These qualifications form the basis for my opinions regarding social media, consumer behavior, and reasonable marketing expectations in this matter.
9. I will continue to review materials and documents related to this case and reserve the right to supplement my expert report based on any additional work that I may be asked to do.

**Documents Reviewed**

10. I have reviewed Clint Sosa's Termination Letter, Health and Lifestyle blogs that Mr. Sosa created the concepts for and wrote, organic social media posts, printed materials created by Mr. Sosa, and the initial Social Media Strategy Deck that Mr. Sosa created but did not finalize due to his termination.
11. I am under the impression that Mr. Sosa also wrote an approved Recognition Thanksgiving Letter for the President that aligned with the request, and Mr. Sosa was praised for his work.

I have not reviewed any website analytics, data, audits and other reporting pertaining to the eight websites that Mr. Sosa managed while employed by HSA.

**Background**

12. It is my understanding that Mr. Sosa was terminated, and HSA has accused him of financial loss due to HSA's incomplete and inaccurate offboarding of his employment, specifically pertaining to HSA's lack of social media account access for a few weeks.
13. While Mr. Sosa was employed, he performed as the "entire marketing department". There were limited budgets for Marketing and no budget allocated for advertising.
14. Mr. Sosa served as a marketing strategist, writer, and designer; however, the company did not provide access to licensed design software programs. Providing licensed software is the obligation of the employer (e.g., the Chief Operating Officer).
15. It is my understanding that Mr. Sosa completed many tasks during the three months of employment, and at no point did the COO, to whom he reported directly, raise any concerns about Mr. Sosa's performance or the quality of his work. The services he performed include,
    a. Researched, developed, and consistently deployed content for the digital channels
    b. Designed print collateral for physician onboarding and service line promotion.
    c. Developed a draft for the system's marketing strategy, made revisions upon request from the COO, and began executing the free/organic options.
    d. Developed relationships with the eight local leadership teams (met with the hospital presidents in December and followed up in January and February).

                i. Developing rapport was important to establishing the flow of local content used for organic posts.
     e. Audited, updated, and quickly addressed compliance concerns for the eight hospital websites.
16. Based on the accusations by HSA, in my expert opinion, I have provided a Statement for Marketing Rationale for Mr. Sosa.

**Statement of Marketing Rationale by Heather J. Taylor**

Purpose of Organic vs. Paid Social Media

In contemporary digital marketing, organic social media and paid social media serve different, complementary functions. Organic content primarily supports brand visibility, trust, and community engagement over time, while paid social media is the primary lever for driving targeted reach, lead generation, and measurable conversions such as appointment requests or service line inquiries.

**Industry research shows that:**
- **Organic social** is most effective for relationship building, reputation, and ongoing education, not short-term sales.

- **Paid social** allows hospitals to reach defined audiences on demand (by geography, demographics, interests, and behaviors) and is the most reliable way to impact near-term volumes for specific service lines.

**Limited Direct Sales Impact of Organic Posting Gaps**

For hospitals and healthcare systems, patient acquisition and case volumes are influenced primarily by physician referrals, insurance networks, search engines, and paid campaigns—not by the week-to-week frequency of unpaid social posts. While consistent organic activity is recommended as a best practice, industry guidance emphasizes that its benefits are long-term (trust, brand authority, search visibility), rather than immediate revenue drivers.

Accordingly, a gap of several weeks—or even months—in purely organic posting, without any reduction in paid advertising, referral streams, or clinical capacity, is not expected, from a professional marketing standpoint, to cause a material decline in hospital sales or census. During such periods, existing content, website assets, physician networks, and ongoing paid campaigns continue to inform and attract patients.

**Strategic Role of Social Media Advertising**

When the organizational goal is to support the sales/revenue function—e.g., to increase elective procedures, clinic visits, or event registrations—**paid social media advertising is the appropriate strategic tool – not organic social posts.**

**Paid campaigns:**
- Provide predictable reach and impression levels within defined geographic and demographic parameters.

- Allow for clear tracking of click-throughs, form fills, appointment requests, and other conversion metrics tied to revenue.

- Can be turned up or down in alignment with service line capacity, seasonality, or promotional windows, something organic reach alone cannot reliably achieve.

- Without an allocated ad budget, social profiles function primarily as always-on brand assets—useful for recognition, loyalty, and basic updates—but they should not be characterized as a direct response sales channel. This distinction is consistent with contemporary best practices in healthcare marketing, which recommend a hybrid approach: organic for reputation and education; paid for demand generation and measurable growth.

**Conclusion**
In summary, as a marketing matter, the hospital's sales performance should be evaluated in light of its full media mix—referrals, search, traditional advertising, and paid digital—rather than short-term fluctuations in unpaid social posts. In the absence of funded social media advertising, organic profiles reasonably serve as vehicles for brand recognition, patient education, stakeholder communication, and community engagement, rather than primary drivers of revenue.